**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **MIGDALIA FORT, M.D.,** | **Case No. 21–cv–20656–ESK–AMD** |
| **Plaintiff,** | |
| v. | **OPINION** |
| **DOUGLAS A. COLLINS,** Secretary of Veterans Affairs,[1] | |
| **Defendant.** | |

**KIEL, U.S.D.J.**

After serving 30 years as a psychiatrist for the United States Department of Veterans Affairs (the Department), plaintiff Migdalia Fort, M.D. received a pair of cancer diagnoses. She faced substantial medical and financial hardships in the year that followed. In the weeks leading up to Fort's return to the Department, the parties worked toward arriving at a reasonable accommodation for her to continue receiving her life-sustaining treatment. But as her return date neared, Fort opted to retire rather than report without a reasonable accommodation in place. She now brings claims of retaliation and disability and age discrimination. Though Fort presents a sympathetic case, it does not necessarily follow that there is liability to be found. Because

---

[1] Robert L. Wilkie served as Secretary of Veteran Affairs at the time this action was initiated. (ECF No. 1 (Initial Compl.).) Collins assumed the role at the time the pending motion was noticed (ECF No. 104) and continues to hold that position, *see* Douglas A. Collins, *U.S. Dep't of Veterans Affs.*, https://department.va.gov/staff-biographies/douglas-a-collins/ (last visited April 27, 2026). Public officers are automatically substituted by their successor when they cease to hold office. *See* Fed. R. Civ. P. 25(d). For ease of reference, this opinion will use the term "Secretary" to refer to Collins and his predecessors collectively.

I find that the Department worked in good faith to accommodate Fort and no reasonable jury could conclude that its nondiscriminatory actions were pretextual, the Secretary's motion for summary judgment (ECF No. 104) will be granted.

## I.    BACKGROUND

Fort was born in 1949 and began work at the Department in 1989 as acting chief of psychiatry. (ECF No. 89–1 (Sec'y Ex. A) pp. 9:6–7, 85:21–24.) Manjula Chilakapati, M.D. became the New Jersey deputy chief of mental health for the Department in 2015 and was Fort's direct supervisor from that point on. (ECF No. 89–3 (Sec'y Ex. C) pp. 29:11–15, 36:20–37:7.) Saila Donepudi, M.D. served as associate chief of staff (ECF No. 89–4 p. 28:10–19) and supervised Chilakapati (Sec'y Ex. C pp. 33:21–34:13).

Fort worked in a variety of roles during her career (Sec'y Ex. A pp. 86:21–88:10, 92:14–93:18) before retiring on September 30, 2019 (*id.* p. 129:20–24; ECF No. 89–2 (Sec'y Ex. B)).   The circumstances of Fort's retirement and the events preceding it provide the basis for her pending claims.

### A.    Fort's Diagnosis and Initial Actions

On October 9, 2018, Fort emailed Chilakapati stating that she needed to leave at noon for an eye appointment.   (ECF No. 99–3 p. 2.)   Fort also advised that she had two upcoming MRIs that she needed to attend. (*Id.*) Chilakapati responded that it was "better to take [a] sick day on Monday, unless [she was] returning to work" and that attendings were being asked to make up time if they took part of a day off. (*Id.*)   Three days later, Fort wrote to Chilakapati explaining that she was suffering from allergic keratoconjunctivitis and requested that she not be placed in the acute psychiatric unit, where she stated mold had been found.   (ECF No. 99–4 p. 3.)   Chilakapati wrote back that she would have the ice machine in the acute psychiatric unit tested for mold but she otherwise did not have sufficient staff to cover the unit without

2

Fort.  (*Id.* pp. 2, 3.)  Fort was not subsequently assigned to the acute psychiatric unit.  (Sec'y Ex. A p. 266:13–21; Sec'y Ex. C p. 74:9–11.)[2]

Fort was diagnosed with brain and breast cancer in September 2018. (Sec'y Ex. A pp. 199:19–200:10.)  She reported her diagnoses to Chilakapati on October 26, 2018.  (ECF No. 89–7 (Sec'y Ex. G) p. 4.)  Fort requested the following week off and stated that she could work a half day on her return date. (*Id.*)  Chilakapati responded that she had arranged for half days based on a prior conversation, "but given the amount of sick leave recently, it [is] better to submit an [Family Medical Leave Act (FMLA)] as this will protect you."  (*Id.*) Chilakapati followed stating that she could grant one day off for a procedure, but it would be difficult to provide an entire week without a doctor's letter.  (*Id.* pp. 3, 4.)

On November 6, 2018, Chilakapati emailed Fort—copying Donepudi and Gilbert Morris, who served as Fort's timekeeper—stating that Fort could not continue to take half days without first obtaining approval, citing human resources guidelines.  (ECF No. 99–14 pp. 2, 3.)  Later that day, Chilakapati sent Fort a copy of the time and attendance policy and stated that she would like to support Fort but needed to follow human resources guidelines.  (ECF No. 99–15.)  She added that she would have human resources send Fort FMLA paperwork.  (*Id.* p. 2.)

---

[2] Fort's statement of material facts alleges mold exposure dating back to the 1990s.  (Fort Statement of Facts pp. 16, 17.)  The Secretary responds that Fort's claims of mold exposure are unrelated to the discrimination and retaliation claims alleged, and form the basis of a separate Federal Tort Claims Act and Federal Employees' Compensation Act case within this District.  (ECF No. 105 (Sec'y Reply Br.) p. 11.)  Indeed, Fort has filed a separate complaint alleging that she was exposed to mold on Department grounds.  (Docket No. 22–00583, ECF No. 59.)  Insofar as Fort believes that the Secretary is mistaken in asserting that her mold exposure claims are unrelated to her instant complaint, that argument was waived when she failed to rebut the Secretary at the motion hearing.

Policy No. HR–03 states that annual and sick leave are to be charged in full-day increments for physicians except when such absence is excused by a supervisor or official, respectively.  (ECF No. 89–6 (Sec'y Ex. F) pp. 4, 8.)  Authority for such excusals is to be exercised only when the absence is of short duration and is not interpreted to cover a major portion of the day.  (*Id.*)  VA Handbook 5975.1 states that, after consulting with the National Regional Accommodations Coordinator or the regional Office of the General Counsel, a designated management official may deny an accommodation request on the basis of undue hardship.  (ECF No. 105–3 p. 33.)[3]  Determination that an accommodation would be an undue hardship means that the Department "finds that a specific accommodation would be significantly difficult to provide, or would fundamentally alter the nature of the operations of the affected [Department] organization."  (*Id.*)

Fort emailed Chilakapati again on November 14, 2018, stating that she needed to leave that day at noon for an appointment.  (ECF No. 89–9 p. 2.)  She acknowledged Chilakapati's prior email about half days and stated that "since I am already here this will be the last one??"  (*Id.*)  Chilakapati granted Fort a full sick day but stated that she could not "keep granting the [half] days since we are required to work 40 hours per week" and there was greater scrutiny within the Department.  (*Id.*)  In a separate email exchange that same day, Chilakapati wrote that she needed Fort to come in early or stay late if she was going to take half days.  (ECF No. 89–8 p. 2.)  She stated that she confirmed applicable regulations with human resources and other attendings

---

[3] Fort makes reference to VA Handbook 5975.1 in her statement of material facts. (Fort Statement of Facts pp. 21, 22, 27.)   But as the Secretary notes (ECF No. 105–1 (Sec'y Counterstatement of Facts) pp. 11, 12, 20), Fort supports these references with citations to VA Directive 5021 (*see* ECF No. 99–17).

4

usually emailed her when they needed to leave work early or come in late and would also inform her of when they anticipated making up the hours.   (*Id.*)

Chilakapati contacted Jerri Casazza, labor and employee relations specialist, on November 14 and November 15, 2018 seeking human resources guidance on Fort's requests.   (Sec'y Ex. G pp. 2, 3.)   Casazza responded on November 27, 2018 stating that half days of sick leave were inappropriate and full days should be taken.   (*Id.* p. 2.)

### B.   Surgery and Leave

Fort underwent brain surgery on November 29, 2018 and resection of her breast tumor on December 3, 2018.   (Sec'y Ex. A p. 261:4–11.)   Fort applied for leave under a voluntary leave transfer program on January 18, 2019.   (ECF No. 89–11.)   The program permitted individuals running out of their own leave to receive leave donated by others.   (ECF No. 89–10 (Sec'y Ex. J) p. 64:18–21.) Following an apparent issue with the Department of Homeland Security, 80 hours of leave from Fort's sister were applied to Fort for the third pay period of 2019.   (ECF No. 89–12 (Sec'y Ex. L) p. 3; ECF No. 89–14 (Sec'y Ex. N) p. 2.)

Another donation from Fort's sister was emailed to Casazza on May 11, 2019, but she was no longer working with the Department at that time and did not have access to her Department emails.   (Sec'y Ex. J pp. 130:2–131:8.) Fort's sister emailed Donepudi and others on June 28, 2019 stating that she had been submitting leave donations and would continue to do so.   (ECF No. 89–13 (Sec'y Ex. M) p. 2.)   Donepudi emailed Regina Pinks, administrative officer, and others to confirm whether the donation had already been used. (*Id.*)   Pinks confirmed that the last donation submitted by Fort's sister had been processed in February.   (Sec'y Ex. N p. 2.)[4]

---

[4] Fort claims that Pinks was referring to a different leave donation in her July 1, 2019 email.   (Fort Statement of Facts p. 5.)   This disagreement is not accompanied by a supporting citation.   *See* L. Civ. R. 56.1(a).   The Court notes that Chilakapati approved a separate 10–day donation on July 19, 2019.   (ECF No. 90–1 p. 2.)   Fort

5

In a December 5, 2018 letter, Fort's physician stated that she had undergone surgery on December 2, 2018 and could return to work by January 2, 2019.   (ECF No. 90–2.)[5]   Chilakapati testified that Fort did not return to work on January 2, 2019 and that she had difficulty contacting her.   (Sec'y Ex. C p.204:15–205:10.)[6]   Fort's physician later wrote that she would not be able to return to work in January 2019, but would likely return in April 2019 instead.   (*Id.* p.216:1–23.)   Subsequent documentation sought for Fort to remain off duty until September 30, 2019.   (ECF No. 90–4 (Sec'y Ex. S) p.2.) On May 20, 2019, Fort emailed Chilakapati, copying Pinks and others, providing work and prognosis information and asking about potential disability pay.   (ECF No. 90–3 (Sec'y Ex. R) p.3.)   Fort later explained her financial situation and stated that she believed that donated leave had not yet been applied.   (*Id.* pp.2, 3.)   Chilakapati emailed Mary D. Forest, human resources specialist, and asked whether retirement and disability retirement information had been sent to Fort.   (*Id.* p.2.)

### C.   Planned Return and Initial Accommodation Requests

In a July 10, 2019 letter, Chilakapati advised Fort that her FMLA leave was exhausted on April 12, 2019, but that—considering Fort's apparent ability

---

testified that she was informed by multiple people that leave had been donated to her but was held up by delays in approval by Donepudi and Chilakapati, though she could not remember specifics.   (Sec'y Ex. A pp.124:3–126:9.)

[5] Fort received treatment in Puerto Rico after her daughter located an oncologist there willing to treat her.   (Sec'y Ex. A pp.22:14–23:6.)

[6] Fort states that she filed an Equal Employment Opportunity Commission (EEOC) complaint on January 18, 2019.   (Fort Statement of Facts p.26.)   She does not support this proposition with the complaint itself, but rather a December 10, 2019 formal statement regarding a post-retirement complaint.   (ECF No. 99–11.)   The Secretary does not dispute that a complaint was filed on January 18, 2019.   (ECF No. 89 p.10 n.3; Sec'y Counterstatement of Facts p.19.)

to return to work by October 1, 2019—she would be granted leave without pay through September 30, 2019.   (Sec'y Ex. S p. 2.)   Chilakapati stated that work needs were such that any additional request would not be granted with the exception of available sick leave.   (*Id.*)   The letter went on to provide various options for Fort if she could not return, including FMLA leave, requesting a reasonable accommodation, disability or regular retirement, and resignation. (*Id.* pp. 2, 3.)   Fort was asked to inform Chilakapati of how she wished to proceed by close of business September 30, 2019.   (*Id.* p. 2.)

On September 6, 2019, Roxanne Robinson-Shaw, human resources specialist, sent Fort forms to be completed in order to make a reasonable accommodation request.   (ECF No. 90–7.)   Fort responded on September 10, 2019.   (ECF No. 90–8 (Sec'y Ex. W).)   The specific request stated that Fort would require an intravenous infusion at a hospital in San Juan, Puerto Rico every three weeks.   (*Id.* p. 5.)   The accommodation was for three days off every three weeks, during which Fort would travel to Puerto Rico on the Wednesday, undergo evaluation on the Thursday, and receive the infusion on the Friday. (*Id.*)   The request noted that Fort was to return to work on September 30, 2019 and would need to first travel to Puerto Rico for treatment from October 16, 2019 to October 18, 2019.   (*Id.*)   This course of treatment was to continue until February 2020, at which point Fort was expected to potentially be able to switch to oral chemotherapy.   (*Id.*)

Robinson-Shaw emailed Donepudi on September 13, 2019, stating that Fort's request was "to have off from work Wednesday through Friday to travel to PR for treatment" until February 2020.   (ECF No. 90–9 pp. 2, 3.)   Donepudi responded to Robinson-Shaw that her supervisor did not "think that this would be a reasonable accommodation if she [cannot] come to work 3 days a week." (ECF No. 99–36 (Fort Ex. AI).)   This stance was purportedly communicated to

Fort (ECF No. 99 (Fort Statement of Facts) pp. 28, 29)[7] and Fort testified that Chilakapati tried to force her to transfer her treatment to New Jersey (Sec'y Ex. A p. 108:3–22).

On September 19, 2019, Robinson-Shaw emailed Fort to follow up on a voicemail regarding Fort transferring her treatment to the United States. (ECF No. 90–11 (Sec'y Ex. Z) p. 2.)  She recommended that Fort email her supervisor and service chief to make her reasonable accommodation request. (*Id.*)  Fort responded that she would and also asked for "the retirement plan to consider that, too, just in case."  (*Id.*)  Fort stated if she was to retire, she wanted to do so by the end of the month for pension purposes and opined that she was not wanted or expected back.  (*Id.*)  A retirement meeting was scheduled for September 30, 2019.   (ECF No. 90–14.)

Later on September 19, 2019, Fort wrote to Donepudi and Chilakapati, copying Robinson-Shaw, stating that she understood service needs and their preference that she work fulltime upon her return.   (ECF No. 90–10 (Sec'y Ex. Y) p. 3.)  She stated that she had spoken with her doctor and that she was receiving assistance in transferring her treatment to New Jersey.  (*Id.*)  Under this plan, Fort required the ability to leave work at noon every third Friday in October, November, and December before switching to oral chemotherapy in January.  (*Id.*)  She asked Donepudi and Chilakapati to

---

[7] At least some of the support Fort relies on to evidence that her request for three days off every three weeks was denied comes from a September 25, 2019 email from Robinson-Shaw following Fort notifying the Department that she could not transfer her treatment to New Jersey.  (ECF No. 90–15 (Sec'y Ex. AD) p. 3.)   In that email, Robinson-Shaw communicated that she understood Fort to have requested three days off each week, which Donepudi and Chilakapati believed would represent a hardship. (*Id.* p. 3.)   Robinson-Shaw said that she had not previously stated that the Department could not grant Fort's request for three days off every three weeks. (*Id.*)   Fort's reference to Donepudi writing that she did not think Fort's request was a reasonable accommodation (Fort Statement of Facts p. 28) similarly was in the context of Fort being absent three days per week (Fort Ex. AI).

"[p]lease let [her] know if this accommodation is possible so … that [she could] consolidate [her] plans to return to work." (*Id.*) Robinson-Shaw responded later that day stating that Donepudi was willing to accept the accommodation request and asked Fort to provide a note stating that her treatment had been transferred to New Jersey. (*Id.* p. 2.)

### D.    Final Request and Retirement

Fort emailed Robinson-Shaw on September 25, 2019 stating that her care could not be transferred to New Jersey. (Sec'y Ex. AD pp. 3, 4.) Instead, she would require three days of sick leave every three weeks to travel, be evaluated, receive her infusion, and recover. (*Id.* p. 3.) Fort wrote that, during a phone conversation, Robinson-Shaw had indicated that the Department could not accommodate her request for three days off every three weeks and asked for Robinson-Shaw to confirm that understanding. (*Id.* p. 4.) Robinson-Shaw wrote back stating that it was "not correct" that she had stated that the Department could not grant the request. (*Id.* p. 3.) Rather, it was her understanding that Fort had requested three days off "each week" and Donepudi and Chilakapati had agreed that that would have resulted in a hardship on service. (*Id.*) Robinson-Shaw wrote that she would bring her request to the Department for consideration and asked Fort to provide the time period for which she was requesting the accommodation. (*Id.*)

Fort wrote back rebutting Robinson-Shaw's characterization that she had submitted multiple accommodation requests and, instead, stated she was seeking three days off every three weeks, not every week. (*Id.* p. 2.) Fort indicated that this request was previously verbally declined, but that she believed it to be reasonable, noting that it did not seem as though her absence was causing an undue hardship among her colleagues. (*Id.*)

The next day, Robinson-Shaw noted the apparent "confusion" regarding Fort's accommodation request and stated that she would get back to her

regarding her request.   (*Id.*)   Later, Robinson-Shaw emailed Fort stating that her supervisors were asking for additional information regarding her duties upon her return and during the reasonable accommodation period.   (ECF No. 90–16 (Sec'y Ex. AE) p.3.)   A meeting with Donepudi and Chilakapati was scheduled for September 30, 2019 as "part of the interactive process … to consider possible work adjustments and other factors to consider for" Fort's requested accommodation.   (*Id.*)

Fort replied two days later that, when she was first diagnosed with cancer, Chilakapati did not permit her to use half days and likened her diagnosis to "normal aging." (*Id.* p.2.) She accused Donepudi and Chilakapati of pressuring her to reveal HIPAA-protected information under duress, stated that Chilakapati lowered her clinical evaluation grade for the first time in 30 years following her diagnosis, and opined that she had already provided more information regarding her reasonable accommodation request than was required.   (*Id.*)

Fort predicted that she would be given "the run-around" at the meeting followed by either a denial of her request or other adverse employment action in retaliation for seeking a reasonable accommodation.   (*Id.*)   Fort stated that she intended to retire on September 30, 2019 and asked Robinson-Shaw for assistance in streamlining the retirement process and in helping her initiate an EEOC claim for age and disability discrimination.   (*Id.*)   On September 30, 2019, Fort retired from the Department.   (Sec'y Ex. B.)

### E.   **Procedural History**

Fort filed this action in the District of Puerto Rico on March 18, 2021 (Initial Compl.) and thereafter amended (ECF No. 4).   The Secretary's motion to dismiss for improper venue (ECF No. 15) was denied, but the case was transferred to this District (ECF No. 25).

Fort's second amended complaint asserts three counts: 1) violation of the Age Discrimination in Employment Act (ADEA), 2) discrimination on the basis of disability in violation of the Americans with Disabilities Act (ADA) and Rehabilitation Act, and 3) discrimination and retaliation in violation of Title VII.   (ECF No. 38 (Second Am. Compl.) pp. 16–19.)   The Secretary filed an answer (ECF No. 40) and the case proceeded to discovery.   On March 28, 2024, the case was reassigned to me.   (ECF No. 67.)

On January 15, 2025, the Secretary moved for summary judgment (ECF No. 88), to which Fort filed an opposition (ECF No. 98 (Fort Opp'n Br.)).   I entered an Appendix N order in response to the Secretary's request for an adjournment to file a reply.   (ECF No. 101.)   The Secretary's original motion was administratively terminated, but I stated that the parties' existing briefs and exhibits would be relied upon in deciding the motion.   (*Id.*)

The Secretary filed a new notice of motion (ECF No. 104) followed by the reply brief (Sec'y Reply Br.).   I thereafter held a hearing during which the parties presented oral argument.   (ECF No. 109.)

## II.   MOTIONS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure dictate that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   For a fact to be material, "its resolution must have the potential to affect the outcome of the suit." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022).   "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 203–04 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   Inferences are to be drawn in favor of the nonmovant.   *Id.* at 204.

Local Civil Rule 56.1 provides that "the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue,

in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A court may exercise its discretion in denying a motion that does not comply with Local Civil Rule 56.1. *See Anise v. JPMorgan Chase Bank*, Case No. 16–08125, 2016 WL 9281267, at *1 (D.N.J. Nov. 29, 2016). Local Civil Rule 56.1 further requires that the party opposing summary judgment file a responsive statement of material facts responding to each paragraph of the movant's statement, asserting agreement or disagreement, "and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion …." L. Civ. R. 56.1(a). Any statement that is not clearly and substantively denied with an appropriate citation to the record is deemed admitted pursuant to Local Civil Rule 56.1. *See Coastal Jersey Holdings, LLC v. Giordano*, Case No. 22–02024, 2023 WL 7545301, at *5 (D.N.J. Nov. 14, 2023); *see also* Fed. R. Civ. P. 56(e) (stating that—upon a party's failure to properly address an assertion of fact—a court may provide an opportunity to address that fact, consider the fact undisputed, grant summary judgment if the movant is entitled to it, or issue any other appropriate order).[8]

### III. DISCUSSION

At the heart of Fort's claims is the allegation that the Department discriminated against her on the basis of her disability, specifically by declining

---

[8] These provisions apply to the parties' motion practice. For instance, Fort supports various paragraphs within her statement of material facts with citations to the second amended complaint. (Fort Statement of Facts pp. 15–17, 20, 23, 24, 27.) But "[t]he non-moving party must 'go beyond the pleadings' and 'designate specific facts' in the record 'showing that there is a genuine issue for trial.'" *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 93 (3d Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). More generally, the parties at times cite to supporting exhibits in their statements of material fact that do not support the proposition asserted. The Court has reviewed the parties' briefing and exhibits and arrived at the instant decision based on what is supported by the record.

to provide her a reasonable accommodation. Because my analysis as to this claim will inform the analysis of the remaining claims, I begin there.

### A.    Disability Discrimination (Count 2)

#### 1.    Standard

A *prima facie* case of ADA disability discrimination requires the plaintiff to show that they 1) are disabled within the meaning of the ADA, 2) are otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation, and 3) have suffered an adverse employment decision as a result of discrimination. *Mascarenhas v. Rutgers, State Univ.*, 412 F. Supp. 3d 500, 508 (D.N.J. 2019). The *McDonnell Douglas* burden-shifting framework applies to disability discrimination claims. *Id.* at 507. After plaintiff first establishes a *prima facie* discrimination claim, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action. *Id.* at 507–08. If the defendant provides a legitimate, nondiscriminatory reason, the burden shifts a final time to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason was not the true reason for the action but rather a pretext for discrimination. *Id.* at 508.

The substantive standards for determining liability are the same under the ADA and Rehabilitation Act. *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021). I will therefore not distinguish between them below.

#### 2.    Failure to Accommodate and Constructive Discharge

##### a.    Standards and Party Arguments

I find it most useful to work backward in the chronology of Fort's claims. I therefore begin with her claim that the Department failed to provide her with a reasonable accommodation and she was constructively discharged and forced

13

into retirement.   A plaintiff asserting a failure-to-accommodate claim must establish that 1) they were disabled and the employer knew it, 2) they requested an accommodation or assistance, 3) their employer did not make a good faith effort to assist them, and 4) they could have been reasonably accommodated. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017).   A failure-to-accommodate claim may be viewed as a type of disability discrimination claim wherein the adverse employment action is the refusal to make a reasonable accommodation.   *Fowler v. AT & T, Inc.*, 19 F.4th 292, 306 (3d Cir. 2021).

Courts employ an objective test to determine whether an employee may recover on a constructive discharge claim.   *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010).   The test is "whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign."   *Id.* (alteration in original) (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)). Factors courts have considered include whether the employer 1) threatened the employee with discharge or urged or suggested that they retire, 2) demoted the employee, 3) reduced the employee's pay or benefits, 4) involuntarily transferred the employee to a less desirable position, 5) altered the employee's job responsibilities, or 6) provided unsatisfactory job evaluations.   *Id.* at 503.

The Secretary asserts that Fort's failure to participate in the interactive meeting on September 30, 2019 precludes her claim for failure to accommodate. (ECF No. 88–2 (Sec'y Mot. Br.) pp. 47, 48.)   Instead, Fort elected to retire, depriving the Department of the opportunity to fully consider her disability and the accommondation sought.   (*Id.* pp. 48, 49.)   Fort was also not constructively discharged, according to the Secretary, because she was not at the Department during her absence, meaning that she cannot articulate an intolerable work condition.   (*Id.* p. 34.)   To the extent that Fort has set out a *prima facie* case

14

of discrimination, the Secretary notes that the Department provided Fort with 24 additional weeks of leave to accommodate her condition and approved what was understood to be her accommodation request.   (*Id.* pp. 35, 36.)   When Fort changed her request back to three days off every three weeks, the Department scheduled an interactive meeting.   (*Id.* p. 36.)   Fort cannot show that discriminatory animus motivated the Department's actions, according to the Secretary.   (*Id.* p. 37.)

Fort responds that her failure-to-accommodate claim is supported by the record and a question of fact remains whether the Department acted in good faith.   (Fort Opp'n Br. pp. 44, 45.)   She claims pretext in the Secretary's account of events, demonstrated by the fact that Fort was told to return by October 1, 2019 or be fired, her request for three days off every three weeks was denied, and she was criticized for allegedly making multiple accommodation requests.   (*Id.* p. 38.)   Fort characterizes the scheduled interactive meeting as a "sham" and notes that Donepudi and Chilakapati declined to meet with her on September 30, 2019.   (*Id.* p. 39.)   Any claim that her request for three days off every three weeks would have been a hardship is undercut by the Department's ability to operate during her absence and that a posting for her job was not published until at least a month after she retired.   (*Id.* pp. 39, 40.) Lastly, Fort maintains that she was constructively discharged because she had no choice but to retire after her accommodation request was denied.   (*Id.* p. 33.) Several relevant factors, including threats of termination if she did not return by October 1, 2019 and suggestions that she retire, are present in this case, according to Fort.   (*Id.* pp. 34, 35.)

### b.    **Failure to Accommodate**

My review of the record does not lead me to the same conclusions as Fort. On July 10, 2019, Chilakapati wrote to Fort acknowledging both that she had not reported to work since December 3, 2018 and that she had submitted a

medical note indicating that she would remain off duty until September 30, 2019. (Sec'y Ex. S p. 2.) Chilakapati granted Fort continued leave through that date, advised that further leave could not be approved, and provided Fort with options to consider, including making a reasonable accommodation request. (*Id.* pp. 2, 3.) While Fort now characterizes this as a threat of being fired if she did not return to work, as noted during the motion hearing, Fort's scheduled date of return was based on her own medical documentation.

Fort made a request for an accommodation on September 10, 2019. (Sec'y Ex. W.) A reasonable accommodation includes an employer's reasonable efforts to assist the employee and communicate in good faith. *Colwell*, 602 F.3d at 504. Once an accommodation request is received, the employer must assist the employee through a flexible, interactive process. *Petti v. Ocean Cnty. Bd. of Health*, 831 F. App'x 59, 63 (3d Cir. 2020) "[B]oth employers and employees 'have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith.'" *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999)).

Fort's request sought an accommodation that she be able to take three days off every three weeks to travel to Puerto Rico for treatment. (Sec'y Ex. W p. 5.) The first such accommodation was needed starting October 16, 2019 and it was anticipated that Fort would need three days off every three weeks until February 2020. (*Id.*) Robinson-Shaw relayed this request to Donepudi on September 13, 2019, but did not specify that the absences were only needed every three weeks. (Fort Ex. AI p. 2.) Donepudi responded on September 17, 2019 that her supervisor did not think that it would be reasonable for Fort to be absent three days per week. (*Id.*)

On September 19, 2019, Fort wrote to Donepudi and Chilakapati that she was working toward transferring her treatment to New Jersey, in which case she would require the ability to leave at noon every third Friday until January

16

2020. (Sec'y Ex. Y p.3.) Though Fort now states that her only accommodation request was denied (Fort Statement of Facts p.9), Fort concluded her September 19, 2019 email by asking for confirmation whether "this accommodation is possible" (Sec'y Ex. Y p.3). Robinson-Shaw wrote back that same day that Donepudi was willing to grant Fort that accommodation. (*Id.* p.2.) At that point, a reasonable accommodation had been requested by Fort and granted by the Department.

That arrangement was short-lived because Fort was ultimately unable to transfer her treatment to New Jersey, necessitating a return to Fort's original request for three days off every three weeks. (Sec'y Ex. AD pp.3, 4.) Fort expressly asked whether she was correct in understanding that Robinson-Shaw had told her that the accommodation could not be granted, to which Robinson-Shaw responded that that was incorrect. (*Id.*) Rather, Robinson-Shaw seemed to be confused—believing that Fort's original request was for three days off per week—and indicated that Donepudi and Chilakapati had concluded that such an arrangement would present a hardship. (*Id.* p.3.) A meeting was scheduled for September 30, 2019 as "part of the interactive process" in response to Fort's supervisors' request for additional information regarding her job duties. (Sec'y Ex. AE p.3.)

Confusion regarding her original accommodation request was no doubt frustrating for Fort. But the purpose of the interactive process is to identify both the employee's specific limitations and potential accommodation options. *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 700 (E.D. Pa. 2010). Believing that the September 30, 2019 meeting would be followed by the Department declining her request or performing some other adverse action, Fort elected to retire rather than participate in the meeting. (Sec'y Ex. AE p.2.) Having made that decision, I conclude that no reasonable jury could find for her with respect to her failure-to-accommodate claim.

17

As an initial matter, and as intimated during the motion hearing, I remain unconvinced that Fort's request for three days off every three weeks represented a reasonable accommodation. *See Kinsella v. Ill. Bell Tel. Co., LLC.*, Case No. 18–07803, 2021 WL 3737731, at *7 (N.D. Ill. Aug. 24, 2021) (concluding that the plaintiff's preferred accommodation—five days of paid leave per month—was unreasonable under the ADA); *see also Blake v. UPMC Passavant Hosp.*, 394 F. App'x 940, 941 (3d Cir. 2010) (finding that the employee phlebotomist was not qualified for his position because he could not attend work regularly); *but see Lewis v. Univ. of Pa.*, 779 F. App'x 920, 923 (3d Cir. 2019) (noting that the reasonableness of an accommodation is a question of fact).

More significantly, and accepting the reasonableness of the requested accommodation, I find that no reasonable jury could find that the Department did not make a good faith effort to assist Fort. *See Capps*, 847 F.3d at 157. To the contrary, Chilakapati directed Fort to information concerning the filing of a reasonable accommodation request in the same letter in which she extended Fort's leave in response to her most recent anticipated return date. (Sec'y Ex. S pp. 2, 3.) Fort's second accommodation request was granted. (Sec'y Ex. Y p. 2.)

Fort eventually had to go back to her initial accommodation request— three days off every three weeks—and Fort claims that she documented the verbal denials she had received in response to her initial request. (Fort Statement of Facts pp. 28, 29.) Putting aside that an employer need not provide the exact accommodation requested, *see Yovtcheva v. City of Phila. Water Dep't*, 518 F. App'x 116, 122 (3d Cir. 2013), at least one of these purported documentations was Fort's September 25, 2019 email exchange with Robinson-Shaw (Sec'y Ex. AD). During this exchange, Fort referred to a past phone conversation and specifically asked Robinson-Shaw to confirm whether it was

18

correct that the Department could not grant her requested accommodation of three days off every three weeks. (*Id.* p. 4.) Robinson-Shaw replied that she was incorrect and indicated that the believed hardship on service was in response to an understanding that Fort had requested three days off per week. (*Id.* p. 3.) The next day, Robinson-Shaw confirmed that there was confusion associated with Fort's request (*id.* p. 2) and scheduled a meeting for further discussion (Sec'y Ex. AE p. 3).

At this point, three relevant facts had been communicated to Fort: 1) her understanding that the Department could not grant her desired accommodation was incorrect, 2) Department members had been under the mistaken impression that she sought three days off each week, and 3) her supervisors wished to further discuss her desired accommodation. Her understanding that her preferred accommodation had already been denied had been contradicted by Robinson-Shaw. And any subjective belief that she had that the scheduled meeting was a sham and likely to result in denial of her request or an adverse employment action was untethered to what she had been explicitly informed. She was free at that point to retire, but "'[a]n employer cannot be faulted if after conferring with the employee to find possible accommodations,' the interactive process breaks down due to the employee's actions or omissions." *Baker v. City of Washington*, Case No. 19–00113, 2021 WL 2379709, at *13 (W.D. Pa. June 10, 2021) (quoting *Petti*, 831 F. App'x at 64).

These findings are not intended to minimize the seriousness of Fort's condition or her related stress. Fort no doubt would have preferred to know the exact accommodation available to her in advance of her next treatment, which was under three weeks away. But by unilaterally withdrawing from the interactive process rather than engaging with the Department's apparent good faith efforts to reach an accommodation, she extinguished any subsequently asserted claim of failure to accommodate.

19

###### c.     Constructive Discharge

Fort's claim for constructive discharge fails, too, and for similar reasons. For the purposes of disposition, I presume that Fort can assert a constructive discharge claim despite being on leave in the months preceding her retirement. *See Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 46 (1st Cir. 2003) (considering actions that took place during the plaintiff's medical leave in analyzing her constructive discharge claim).

Again, constructive discharge is an objective test that turns on whether a reasonable jury could conclude that the employer "permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell*, 602 F.3d at 502 (quoting *Duffy*, 265 F.3d at 167).   Fort identifies several circumstances that fit within the relevant factors used within the Third Circuit, including her facing termination if she did not return to work by October 1, 2019, it being suggested that she retire, her accommodation being denied, and her receiving an unsatisfactory evaluation.   (Fort Opp'n Br. pp. 34, 35.)

For the same reasons articulated above, I find that the Department did not deny her accommodation request and the October 1, 2019 return date was informed by Fort's own physician.   Further, while an unsatisfactory evaluation may support a constructive discharge claim, *Colwell*, 602 F.3d at 503, Fort does not claim that she received an unsatisfactory evaluation.   Rather, she received an overall rating of "outstanding" with a reduction in clinical competence from "outstanding" to "high satisfactory."   (Sec'y Ex. A pp. 244:23–245:17.)   This reduction is insufficient to support her claim.   *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993) (finding that the plaintiff did not receive an unsatisfactory job evaluation, but rather a rating of "fair").

This leaves Fort's claims that it was suggested that she retire.   The record shows that the subject of retirement was broached at least in part by

20

Fort herself.   For instance, information regarding retirement and disability retirement was sent to her following her inquiry into how to obtain disability benefits.   (Sec'y Ex. R pp. 2, 3.)   Later, Fort requested that Robinson-Shaw send her retirement information during the email exchange regarding her accommodation.   (Sec'y Ex. Z p. 2.)   Fort would be quick to note that she also stated in that email that she did not believe that her supervisors wanted her back, but Fort brings her subjective belief to an objective standard.[9]   Fort points to no evidence in the record demonstrating that her retirement was involuntary.   *See Jacoby v. Arkema Inc.*, Case No. 06–02339, 2007 WL 2955593, at \*14–15 (E.D. Pa. Oct. 9, 2007) (noting, as part of an ADEA claim, that the plaintiff was not told that his retirement was mandatory and no reasonable person could find receipt of retirement papers that they requested to be so intolerable as to compel retirement).

Fort therefore does not meet any of the factors traditionally relied upon to determine whether an employee has been constructively discharged.   For this reason, and because I find that no reasonable jury could conclude that the Department permitted conditions so unpleasant as to compel a reasonable person to resign, summary judgment will be entered in favor of the Secretary.

### 3.   Additional Disability Discrimination Claims

Fort points to additional allegedly adverse actions, including the Department's interpretation of policies that forced her to exhaust sick leave and delays in processing donated leave.   (Fort Opp'n Br. pp. 31, 32.)   She asserts that the Secretary's proffered rationales are pretextual, citing her supervisor's discretion to have provided her half days and overall lack of compassion.   (*Id.*

---

[9] Fort likewise asserts that Donepudi and Chilakapati declined to meet with her on September 30, 2019.   (Fort Statement of Facts p. 34.)   However, at this point, Fort had already stated that she intended to retire and file an EEOC complaint.   (Sec'y Ex. AE p. 2.)

pp. 37, 38.)   The Secretary responds that Fort identifies nominal actions, such as lower evaluations, that do not rise to the level of an adverse employment action.   (Sec'y Mot. Br. pp. 33, 34; Sec'y Reply Br. p. 7.)

Again, to establish a *prima facie* disability discrimination claim, Fort must show that she "has suffered an otherwise adverse employment decision as a result of discrimination."   *Mascarenhas*, 412 F. Supp. 3d at 508 (quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).   An adverse employment action is "some harm" to a term or condition of employment, an action in which the employee was treated worse due to their protected characteristic.   *Peifer v. Bd. of Prob. and Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)).

With respect to donated time, Fort testified that she was told by multiple people that leave donated to her had been held up, but did not recall specifics. (Sec'y Ex. A pp. 124:3–126:9.)   Looking through the record, an email exchange including Chilakapati, Pinks, and others stated that after participants "kept calling the Homeland Security office," a response was finally received and 80 hours of donated leave—presumably donated by Fort's sister—was available. (Sec'y Ex. L p. 3.)   Fort's sister later emailed Donepudi and Fort on June 28, 2019 stating that she had donated leave to Fort and would continue doing so. (Sec'y Ex. M p. 2.)   An initial attempt to email the Department had been made on May 11, 2019, but was sent to a retired employee.   (Sec'y Ex. J p. 130:2–8.) The email itself does not indicate when the donations were made.   Assuming that there was a delay in processing donated leave, it is unclear whether it was of such extent as to constitute an adverse employment action.   *See cf. Karam v. Cnty. of Rensselaer*, Case No. 13–01018, 2016 WL 51252, at *14 (N.D.N.Y. Jan. 4, 2016) (finding that the inability to utilize donated sick leave constituted an adverse employment action under Section 1981 and New York law).

22

The other actions cited by Fort similarly do not clearly constitute adverse employment actions. *See Sorensen v. Wallingford Bd. of Educ.*, 742 F. Supp. 3d 240, 252 (D. Conn. 2024) (finding that the defendant's requirement that the plaintiff use leave time or sick days for the half days he did not work did not materially alter the terms or conditions of his employment); *Mickens v. Lowe's Cos., Inc.*, Case 07–06148, 2009 WL 4911952, at *9 (D.N.J. Dec. 14, 2009) (finding that a negative performance evaluation did not change the plaintiff's employment status).

Nonetheless accepting these actions as adverse, Fort is unable to overcome the *McDonnell Douglas* burden-shifting framework. The Secretary asserts legitimate, nondiscriminatory reasons for the challenged actions. For instance, the Secretary points to a policy common to all physicians for why Fort was told she could not take incremental leave. (Sec'y Mot. Br. p. 13.) Indeed, Policy No. HR–03 provides that physicians' annual and sick leave are to be charged in full-day increments absent approval. (Sec'y Ex. F pp. 4, 8.) Such approvals are to be exercised only when absences are of short duration. (*Id.*) Application of a neutral policy satisfies an employer's obligation to provide a legitimate, nondiscriminatory reason for an employment action. *See Otero v. Port Auth. of N.Y. and N.J.*, Case No. 19–12634, 2024 WL 3200024, at *9 (D.N.J. June 26, 2024).

Similarly, the Secretary states that any delays associated with processing Fort's sister's leave donations were due to issues with Homeland Security— where Fort's sister worked—and the fact that a retired Department employee was emailed. (Sec'y Mot. Br. pp. 16, 17, 17 n. 5; Sec'y Ex. J p. 130:2–8; Sec'y Ex. L p. 3.) The Secretary attributes the reduction in clinical competence score to Fort's continued prescription of an older antipsychotic medication. (Sec'y Ex. A pp. 244:18–245:17; Sec'y Counterstatement of Facts p. 5.)

Under the burden-shifting framework, Fort must now point to evidence to rebut these legitimate reasons as pretextual. *Mascarenhas*, 412 F. Supp. 3d at 509. She fails to do so.

Of the asserted examples of pretext not rejected above, Fort points to the removal of her timekeeper for—in his opinion—being too kind to Fort, a lack of compassion toward Fort, and the fact that Department policies permitted the use of discretion. (Fort Opp'n Br. pp. 37, 38.) Elsewhere, Fort references Chilakapati's characterization of her ailments as "normal aging" and stating that Fort was "crying" about her conditions. (*Id.* p. 31.)

Reviewing the evidence in the light most favorable to her, I find that Fort's proffered examples of pretext at best demonstrate that members of the Department were insensitive to her needs and were imprudent or ineffective in assisting her. Fort may have been disappointed in her supervisors' responses during her diagnosis and treatment, but an employer "has no obligation to be compassionate, and its failure to be so is not evidence of pretext." *Silver v. Entergy Nuclear Operations, Inc.*, 290 F. Supp. 3d 234, 249 (S.D.N.Y. 2017). It is not enough that the Department may have been wrong in its proffered reason. *See Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 596 (E.D. Pa. 2019). The proffered reason must be so wrong that it could not have been the real reason for its actions. *See id.* "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* (alteration in original) (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). Because I find that no reasonable jury could conclude that the proffered reasons were pretextual, summary judgment will be entered in favor of the Secretary.

## B.  Age Discrimination (Count 1)

An ADEA claim applies the same *McDonnell Douglas* burden-shifting framework described above. *See Willis v. UPMC Children's Hosp. of*

24

*Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). To set forth a *prima facie* age discrimination claim, the plaintiff must have 1) been at least 40 years old, 2) suffered an adverse employment action, 3) been qualified for the position, and 4) replaced by another employee of sufficiently younger age as to support an inference of discriminatory motive. *Id.* To prevail on an ADEA claim, the plaintiff must establish by a preponderance of the evidence that age was the but-for cause of the identified adverse action. *Id.*

The Secretary argues that Fort offers no evidence that she was treated less favorably than other employees and—instead—relies on vague allegations. (*Id.* pp.30, 31.) Fort's subjective belief that she was discriminated against is insufficient to stave off summary judgment, according to the Secretary. (*Id.* pp.31, 32.)

Fort focuses on the final prong of the analysis, stating that there is evidence of discriminatory motive, including comparator evidence. (Fort Opp'n Br. pp.27, 28.) She points to younger employees who were purportedly provided reasonable accommodations, while she was not. (*Id.* pp.28, 29.)

To begin, insofar as Fort relies on purported denial of an accommodation, unreasonable interpretation of Department policies, and lack of empathy, my above analysis and rejection of these arguments apply equally here. *See Walker v. U.S. Sec'y of the Air Force*, 7 F. Supp. 3d 438, 453 n.3 (D.N.J. 2014) ("[T]he ADA, ADEA and Title VII all ... prohibit discrimination in employment against members of certain classes .... the methods and manner of proof under one statute should inform the standards under the others as well." (omissions in original) (quoting *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 157 (3d Cir.1995)).

To the extent that Fort submits comparator evidence,[10] she relies largely on the testimony of Pinks.   Pinks, an administrative officer who was 62 at the time of her deposition, testified that she was permitted to work from home for about three months following knee surgery.   (ECF No. 99–30 pp. 14:9–11, 23:13–24:18, 34:5–35:17.)   Pinks also testified that a younger woman she supervised was permitted to work from home certain days for six months due to a back injury.   (*Id.* pp. 36:9–37:7.)

Fort fails, though, to demonstrate that Pinks or her subordinate were similarly situated to her.   When a plaintiff seeks to make out a *prima facie* case by referring to similarly situated employees, those employees must be similarly situated "in all relevant respects," such as having the same supervisors and job responsibilities.   *Chase v. Frontier Commc'ns Corp.*, 361 F. Supp. 3d 423, 436–37 (M.D. Pa. 2019) (quoting *Wesley v. Simona Am. Inc.*, Case No. 15–01110, 2016 WL 8613937, at *6 (M.D. Pa. Nov. 3, 2016), *report and recommendation adopted*, 2017 WL 1173931 (M.D. Pa. Mar. 29, 2017)).   Here,

---

[10] The Secretary asserts that the second amended complaint does not allege a disparate treatment claim and one should not be considered here.   (Sec'y Mot. Br. p. 28.)   Even if one is asserted, it fails for lack of comparator evidence, according to the Secretary.   (*Id.* pp. 28–32.)   Fort maintains that Counts 1 and 2 allege that she was discriminated against due to her age and disability and was treated differently for those reasons.   (Fort Opp'n Br. pp. 24, 25.)   At the motion hearing, counsel conceded that a disparate treatment claim was not expressly pleaded, but that there was a basis for one and sufficient comparator evidence had been presented.   I agree with counsel that no disparate treatment claim is expressly pleaded.   This alone warrants rejection of any distinct disparate treatment claim now asserted.   *See Warfield v. SEPTA*, 460 F. App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment."); *see also Gurvey v. Twp. of Montclair*, Case No. 19–17525, 2022 WL 970303, at *18 n. 23 (D.N.J. Mar. 31, 2022) (declining to consider reformulated claims at summary judgment).   Even accepting that such a claim was pleaded, Fort fails to identify a sufficient comparator for the reasons that follow.   This conclusion, arrived at here while considering Fort's age discrimination claim, also applies to her disability discrimination claim insofar as she relies on these comparators.   *See Jenkins v. Cornerstone Relocation Grp., LLC*, Case No. 23–01755, 2025 WL 360553, at *7 (D.N.J. Jan. 31, 2025) ("Disparate treatment claims under the ADA [and] ADEA … generally follow the same standards.").

26

Pinks—who worked in administration—and her subordinate are inapt comparators for Fort to set forth her discrimination claim.   *See Baron v. Abbott Lab'ys*, 672 F. App'x 158, 161 (3d Cir. 2016) (finding that neither identified employee was similarly situated to the plaintiff because they possessed different responsibilities).

Fort attempts to preserve her claim by stating that she "testified that she recalled several other employees receiving reasonable accommodation, including at least one psychiatrist like herself."   (Fort Opp'n Br. p. 28.)   But that overstates her testimony.   Fort testified that she thought that another psychiatrist, supervised by Chilakapati, was provided favorable treatment that she did not receive.   (Sec'y Ex. A pp. 82:15–83:17.)   She could not remember the fellow psychiatrist's name or face.   (*Id.* p. 83:5–8.)

Following Fort's deposition, the Secretary submitted a request for production seeking "all documents supporting the contention that other [Department] psychiatrists received more favorable treatment as it relates to taking medical leave and seeking accommodations."   (ECF No. 90–17 p. 9.) Fort's counsel responded by referring to Fort's deposition testimony and stating that Fort "is not in possession of responsive documents."    (ECF No. 90–18 p. 2.) Her reference, then, to an unidentified psychiatrist to whom she seeks to compare herself is insufficient to preserve her claim.   *See Bock v. Novartis Pharms. Corp.*, 661 F. App'x 227, 233 (3d Cir. 2016) ("[S]peculation cannot stave off summary judgment; '[t]o the contrary, "summary judgment is essentially 'put up or shut up' time for the non-moving party" who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.""" (second alteration in original) (quoting *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016)).

Lastly, even if I were to conclude that a reasonable jury could find that Fort has set forth a *prima facie* claim of age discrimination, and I do not, the

claim fails under the same burden-shifting analysis conducted above.   *See Ball v. Einstein Cmty. Health Assocs., Inc.*, 514 F. App'x 196, 199–202 (3d Cir. 2013) (analyzing the pretext analysis for the plaintiff's ADEA and ADA claims together).   Because I find that Fort has failed to rebut the legitimate, nondiscriminatory reasons proffered by the Secretary, her ADEA claim nonetheless fails.

## C.    Retaliation Claim (Count 3)

Title VII prohibits discrimination against an employee due to their opposition to an unlawful employment practice or filing of a charge.   42 U.S.C. §2000e–3(a).   To set forth a *prima facie* Title VII retaliation claim, a plaintiff must show that 1) they engaged in activity protected by Title VII, 2) their employer took an adverse action against them, and 3) a causal connection exists between the protected activity and adverse action.   *Smith v. City of Atl. City*, 138 F.4th 759, 775 (3d Cir. 2025); *see also Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 306 n.3 (3d Cir. 2015) (noting that the antiretaliation provisions of Title VII, the ADA, and ADEA are "nearly identical") (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)).   The now-familiar burden-shifting framework applied above also applies to Title VII retaliation claims.   *Smith*, 138 F.4th at 775.

The Secretary advances that Fort is unable to meet the second and third prongs of the *prima facie* analysis. (Sec'y Mot. Br. pp.38, 39.)   The Department did not constructively discharge Fort or delay processing leave donations, according to the Secretary, and other identified actions such as requiring her to use full days of leave and lowering an evaluation score were not materially adverse.  (*Id.* pp.40–42.)   Even assuming that the adverse action requirement is met, there is no indication that there was a causal connection between the protected activity and adverse actions.  (*Id.* p.42.)   Several alleged actions took place before Fort filed her EEOC complaint and

28

others—with the exception of the initial processing of leave donation paperwork—were not within sufficient temporal proximity to the complaint. (*Id.* pp. 42–44.)  Finally, the Secretary states that the Department had legitimate reasons for its actions and Fort cannot establish that those reasons were pretextual.  (*Id.* pp. 44, 45.)

Fort replies that numerous actions were taken against her—culminating in her constructive termination—and the Secretary does not dispute that these actions occurred, just that they were nominal.  (Fort Opp'n Br. pp. 40, 41.)  In addition to the EEOC complaint, Fort points to her accommodation requests and asserts that additional evidence aside from temporal proximity may demonstrate a causal connection.  (*Id.* pp. 42, 43.)  Finally, Fort argues that the Secretary's proffered reasons are pretextual for similar reasons as argued in support of her discrimination claim.  (*Id.* p. 43.)

I note that a broader definition of adverse actions apply to retaliation claims as compared to discrimination claims.  *See Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012).  While an adverse employment action requires harm to a term or condition of employment for a discrimination claim, *see Peifer*, 106 F.4th at 277, an adverse employment action in the retaliation sense "must be 'materially adverse[,]' such that it is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" *Smith*, 138 F.4th at 775 (alterations in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

This difference does not resuscitate Fort's constructive discharge or failure-to-accommodate claims.  "The Third Circuit has noted that a failure-to-accommodate claim cannot also be characterized as a retaliation claim because an employer's declination to provide an accommodation constitutes an 'alleged failure[] to fulfill the affirmative duties prescribed by the ADA' rather than an action prohibited by the statute."  *Vought v. Twin Tier Hosp., L.L.C.*, Case No.

29

18–1113, 2019 WL 2501470, at \*7 (M.D. Pa. June 17, 2019) (alteration in original) (quoting *Pagonakis v. Express LLC*, 315 F. App'x 425, 431 (3d Cir. 2009)).  Fort therefore cannot repackage her failure-to-accommodate claim rejected above to support her retaliation claim.  I further find that my conclusion above that Fort has failed to support that she was constructively discharged applies here.  *See McGlotten v. Omnimax Int'l, Inc.*, 657 F. Supp. 3d 663, 675 (E.D. Pa. 2023) (applying the same standard as used above in analyzing a Title VII retaliation claim premised on constructive discharge).

This leaves Fort's claims that she was given a reduced performance rating, required to take full days off for medical appointments, and unable to timely access donated leave due to delays.  I am satisfied that these actions may dissuade a reasonable employee from engaging in protected activity.  *See Smith*, 138 F.4th at 775.  While some of the Department's actions took place prior to Fort's EEOC complaint, I find that even interpreting requests related to half days and the acute psychiatric unit as protected activity,[11] the claims fail under the burden-shifting analysis.

As discussed above, the Department policy requiring leave to be taken in full-day increments applied generally to all physicians.  (Sec'y Mot. Br. p. 45; Sec'y Ex. F pp. 4, 8.)  Delays associated with processing donated leave are attributable to issues within Homeland Security and a retired employee being emailed.  (Sec'y Mot. Br. pp. 16, 17, 17 n. 5; Sec'y Ex. J p. 130:2–8; Sec'y Ex. L p. 3.)  Finally, the reduction in Fort's clinical competence score was due to her prescribing an older medication.  (Sec'y Ex. A pp. 244:18–245:17; Sec'y

---

[11] Insofar as Fort's retaliation claim is premised under Title VII (Second Am. Compl. p. 19), "[r]equesting an accommodation *alone* is not protected activity under Title VII …."  *Leite v. Sch. Dist. of Phila.*, Case No. 22–00306, 2023 WL 12242345, at \*1 n. 1 (E.D. Pa. Feb. 27, 2023) (applying Title VII retaliation to a pregnancy discrimination claim).

Counterstatement of Facts p. 5.)    These represent legitimate, non-retaliatory reasons for the cited actions.

The burden now flips back to Fort.    And it is not enough that Fort may point to evidence that gives rise to an inference of a causal connection between her protected activity and the adverse actions.    *See Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95–96 (3d Cir. 2016).    While such evidence may be sufficient at the *prima facie* stage, causation differs once the burden-shifting framework arrives at whether the defendant's proffered nondiscriminatory reasons are pretextual.    *Id.*    Rather, "to prove causation at the pretext stage, the plaintiff must show that she would not have suffered an adverse employment action 'but for' her protected activity."    *Id.* at 96 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).    Courts have rejected evidence such as temporal proximity and similar conduct by fellow employees to demonstrate causation.    *See, e.g., Wilmoth v. Arpin Am. Moving Sys., LLC*, Case No. 19–19187, 2024 WL 3440218, at *11 (D.N.J. July 17, 2024).

Fort refers the Court back to her claims of pretext as part of her discrimination claim.    (Fort Opp'n Br. pp. 36–40, 43.)    These claims, such as lack of compassion and failure to exercise discretion in providing half days of leave, do not provide a basis for a reasonable jury to conclude that the challenged actions would not have occurred but for Fort's protected activity. *See Demarzo v. Del. River and Bay Auth.*, Case No. 23–22623, 2026 WL 836900, at *10 (D.N.J. Mar. 26, 2026) (finding that the plaintiff's questioning of the wisdom of the defendant's termination decision did "not create a genuine dispute that the [reason] 'was false, and that retaliation was the real reason for the adverse employment action'" (quoting *Smith*, 138 F.4th at 778)); *Glaesener v. Port Auth. of N.Y. and N.J.*, Case No. 20–02294, 2023 WL 8272054, at *8 (D.N.J. Nov. 30, 2023) (concluding that a failure to exercise discretion in awarding a promotion to a lower-scoring candidate did not evidence pretext).

31

Summary judgment will therefore be entered against Fort as to her retaliation claim.

## IV.   CONCLUSION

For the foregoing reasons, the Secretary's motion for summary judgment (ECF No. 104) will be GRANTED.   An appropriate order accompanies this opinion.

/s/ Edward S. Kiel
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  April 29, 2026

32